IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARK COGHILL II** <br> 2020 Brooks Drive #812 <br> District Heights, MD 20747 <br> **Plaintiff,** <br> <br> vs. <br> <br> **MedStar National Rehabilitation Hospital, Inc.** <br> 102 Irving Street NW <br> Washington, DC 20010 <br> **Defendant,** <br> <br> *Serve Resident Agent:* <br> The Corporation Trust, Incorporated <br> 2405 York Road, Suite 201 <br> Lutherville Timonium MD 21093-2264 <br> <br> **MedStar National Rehabilitation Network, Inc.** <br> 102 Irving Street NW <br> Washington, DC 20010 <br> **Defendant.** <br> <br> *Serve Resident Agent:* <br> The Corporation Trust, Incorporated <br> 2405 York Road, Suite 201 <br> Lutherville Timonium MD 21093-2264 | **Civil Action No.** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. Plaintiff Mark Coghill II, by and through undersigned counsel, brings this civil action against MedStar National Rehabilitation Hospital, Inc. and MedStar National Rehabilitation Network, Inc. ("MedStar" or "Defendants") for equitable relief and compensatory, consequential and punitive damages and lost wages for the injuries Plaintiff suffered by reason of the Defendant's discriminatory acts in violation of

1

American with Disabilities Act, Title VII of the Civil Rights Act of 1964, and the D.C. Human Rights Act of 1977, as amended.

## Jurisdiction and Venue

2. This Court has original jurisdiction over Counts I and III pursuant to 28 U.S.C. § 1331 because those claims arise under the laws of the United States.

3. This Court has supplemental jurisdiction over Counts II and IV of this Complaint, which arise under the laws of the District of Columbia pursuant to 28 U.S.C. §1367(a), because the claims in Counts II and IV arise from a common set of operative facts with Counts I and II. Thus, the claims are so related to the claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy.

4. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391 because the claim arose in the District of Columbia and Defendant conducts business in the District of Columbia.

## Exhaustion of Administrative Remedies

5. Plaintiff filed his Charge of Discrimination with the D.C. Office of Human Rights (DCOHR) on August 6, 2020, and cross-filed it with the Equal Employment Opportunity Commission (EEOC).

6. Plaintiff requested to withdraw his Charge of Discrimination on August 9, 2022 in order to pursue a civil action. *See* Exh. 1.

7. On August 11, 2022, DCOHR issued an Order for administrative dismissal because "The Complainant has submitted a written request to withdraw the complaint. 4 DCMR § 708.1." *See* Exh. 2.

8. On August 11, 2022 the EEOC issued a Closure Letter regarding Plaintiffs'

claims cross-filed with the EEOC, which Plaintiff received on October 6, 2022. *See* Exh. 3.

9. This civil action is being filed within the one year statute of limitations under the DCHRA, including accounting for tolling for the time the charge was pending at the DCOHR, and within 90 days of the EEOC issuing its Closure Letter.

10. All statutory prerequisites for bringing this action have been timely satisfied.

## Parties

11. Plaintiff Mark Coghill II ("Mr. Coghill") is a citizen of the United States and an adult resident of Maryland. He currently resides at 2020 Brooks Drive #812, District Heights, MD 20747. Mr. Coghill served as a Rehabilitation Care Technician for the MedStar National Rehabilitation Hospital, and its parent company, MedStar National Rehabilitation Network, Inc., in the District of Columbia from approximately February 10, 2020 to his termination on August 7, 2020. He is an adult, homosexual, black man who is a pastor in his church, and has a been diagnosed with a medical condition which suppresses his immune system and is a recognized disability under both the District of Columbia Human Rights Act (DCHRA) and the Americans with Disabilities Act (ADA), and is a qualified individual with a disability under the DCHRA and the ADA (hereinafter his "Immunocompromising Disability").

12. Defendant MedStar National Rehabilitation Hospital, Inc. (the "Hospital") is a specialty hospital offering programs designed to aid in the rehabilitation of individuals with disabling injuries and illness, particularly brain injury and disease, spinal cord injury and disease, stroke recovery, cardiac rehabilitation, orthopedics, and pediatric rehabilitation. It is owned and operated by Defendant MedStar National Rehabilitation

3

Network, Inc., and is a member of the MedStar Heath system, Washington, D.C.-Baltimore region's largest non-profit healthcare organization.

13. Defendant MedStar National Rehabilitation Network provides inpatient, outpatient, and day treatment programs designed to aid in the rehabilitation of individuals with disabling injuries and illness, particularly brain injury and disease, spinal cord injury and disease, stroke recovery, cardiac rehabilitation, orthopedics, and pediatric rehabilitation, and owns and operates Defendant MedStar National Rehabilitation Hospital, Inc. is a member of the MedStar Heath system, Washington, D.C.-Baltimore region's largest non-profit healthcare organization.

### Mr. Coghill's Disability Accommodation

14. MedStar hired Mr. Coghill to work as a Rehabilitation Care Technician on floor 2West in the Hospital's Stroke and Spinal Unit. Mr. Coghill began his position for MedStar on or about February 10, 2020.

15. By early March 2020, the COVID-19 (a.k.a. the "coronavirus" or "COVID") pandemic hit the Washington, D.C. region. On March 24, 2020, Muriel Bowser, the mayor of Washington, D.C. issued an Executive Order closing all non-essential businesses in Washington, D.C.

16. COVID-19 is, and was understood in the time period relevant to this Complaint, to be a highly contagious virus, and that individuals with certain medical conditions, including Mr. Coghill's Immunocompromising Disability, are at higher risk if they catch COVID-19, including prolonged complications and/or death.

17. In the early weeks of the COVID-19 pandemic, Mr. Coghill was not assigned to work on the COVID-19 floors and/or with patients diagnosed with COVID-

4

19. On or around the middle of March 2020, the Hospital changed its policy, and began rotating its employees to work on the COVID-19 floor. Mr. Coghill was one of the employees subject to the new rotation policy, and would be rotated onto the COVID-19 floor.

18.     Due to his Immunocompromising Disability, Mr. Coghill faced a heightened risk if he became infected with COVID-19. Mr. Coghill had never previously disclosed his Immunocompromising Disability because there had been no need to do so. Similarly, Mr. Coghill had never previously asked for reasonable accommodations for his Immunocompromising Disability because he had not needed any reasonable accommodations to work as a Rehabilitation Care Technician in the Hospital's Stroke and Spinal Unit.

19.     In approximately the middle of March 2020, Mr. Coghill informed his supervisor, Nailah Kilemi, the Unit Manager at the Hospital, that he had a disability that compromised his immune system and made him particularly vulnerable to COVID-19 and that, therefore, he could not go onto a COVID-19 unit. Ms. Kilemi directed Mr. Coghill to put in a request to the Hospital's Occupational Health department.

20.     Mr. Coghill contacted Occupational Health, who informed him that he would need a medical note for an accommodation. Mr. Coghill then contacted his physician to obtain a medical note to submit to Occupational Health. On April 22, 2020, Mr. Coghill's physician, Dr. Patrick J. Haugh, wrote a note to MedStar, requesting that he receive an accommodation and not be placed in higher risk areas for COVID-19 exposure. This was due to Mr. Coghill's "increased risk [of] illness from contracting Covid-19" due to his disability.

21. Mr. Coghill promptly provided the note to MedStar's Occupational Health Department at the instruction of Assistant Unit Manager, Wongel Mengiste. Only two days later, on Friday, April 24, 2020, MedStar approved his accommodation. In an email from Nurse Practitioner Lauren Skowera, Mr. Coghill was informed that he would be exempt from care of both COVID-19 positive patients and those under investigation for potentially having COVID-19.

22. MedStar continued to provide him with this reasonable accommodation, and Mr. Coghill continued to work hard for MedStar. This all changed after Mr. Coghill made complaints about discrimination.

### Discriminatory Statement

23. On or about June 7, 2020, Mr. Coghill worked the night shift and was helping Nurse Francisca Obu change a patient. He expressed offhandedly that he was tired. Ms. Obu asked, "Why are you so tired? You didn't get any sleep this morning?" or words to that effect. Mr. Coghill replied that he only had four hours of sleep before going to church, referring to the virtual church services he conducted for the church where he was a pastor.

24. During this time during the pandemic, including the time referenced here to Nurse Obu by Mr. Coghill, the church where Mr. Coghill served as a senior pastor did not hold in-person services. Instead, Mr. Coghill conducted the church services via podcast and virtual broadcast from his church while the church was empty of all parishioners and staff. Due to COVID-19 precautions, the only individuals present were Mr. Coghill and his significant other who would help record/broadcast the service.

25. During the discussion that naturally followed between Mr. Coghill and Nurse Obu, Mr. Coghill shared that he is the church's Senior Pastor. Immediately and in front of the patient, Ms. Obu exclaimed, "Senior pastor? I thought you were gay."

26. Mr. Coghill was shocked and offended by Ms. Obu's words, and believed she was engaging in discrimination and discriminatory stereotyping. He understood her comment to be a negative comment about his sexual orientation, and/or stereotyping comment about his religion as fundamentally closed minded and unwelcoming to gay people. He avoided her for the rest of the shift and informed his manager of her discriminatory comment.

27. Mr. Coghill was aware that MedStar had policies prohibiting employment discrimination, and that MedStar policies stated that if an employee believed they were experiencing discrimination, they were supposed to report it. He also knew that MedStar's policies promised that employees would not experience any form of retaliation for making a good faith complaint of discrimination.

28. In accordance with MedStar policies and promises to protect him from retaliation, on June 11, 2020, Mr. Coghill filed a written statement and formal grievance with MedStar's Human Resources alleging that he was being discriminated against by Nurse Obu for her comment.

29. On June 25, 2020, Mr. Coghill met with Tia Merriweather, the Director of Human Resources for the hospital. During that meeting, Ms. Merriweather told him that Ms. Obu had admitted to her statement.

**Unlawful Retaliation and Denial of a Reasonable Accommodation**

30. In direct response and in retaliation to Mr. Coghill's discrimination complaint, MedStar transferred Mr. Coghill to Floor 3East, commonly called the "COVID floor" or "COVID Unit" by the workers at MedStar, and a floor designated by MedStar for treatment of COVID-19 patients and patients who may have been exposed to COVID-19. Floor 3Eastwas the very place that MedStar knew he could not work due to his disability and previously provided reasonable accommodations due to his Immunocompromising Disability. MedStar, however, allowed Ms. Obu to remain on Floor 2West, the non-COVID-19 floor.

31. For any employee, working on the COVID-19 Unit is a substantially worse term and condition of employment than working on a non-COVID-19 unit. For Mr. Coghill, it was a significantly worse term and condition of his employment and a potentially deadly work assignment due to his diagnosed Immunocompromising Disability. Working on a COVID-19 unit with guaranteed exposure to COVID-19 patients put Mr. Coghill at serious medical risk due to his Immunocompromising Disability.

32. Mr. Coghill learned of his transfer during a phone conversation with Ms. Wongel Mengiste, who approved the transfer. This was the same MedStar employee who had previously advised Mr. Coghill on how to submit his accommodation request. Ms. Mary Shahady, a Nursing Supervisor, executed the transfer and instructed Mr. Coghill to go to Floor 3East, a floor where COVID-19 patients and those suspected of having the illness were treated.

33. There was no legitimate non-discriminatory reason for transferring Mr. Coghill to the COVID-19 Unit. If MedStar needed to transfer a party involved in the inappropriate comment made by Ms. Obu, then Ms. Obu should have been transferred to the COVID-19 Unit, and Mr. Coghill, because of his disability and his already-existing, approved accommodation, should have remained on Floor 2West, the non-COVID-19 floor.

34. There was no legitimate, non-discriminatory reason for rescinding the *already-in-place* accommodation that MedStar was providing to Mr. Coghill prior to him reporting a complaint of discrimination. Transferring Mr. Coghill to the COVID-19 unit blatantly violated the terms of the reasonable accommodation that MedStar had agreed to provide him.

35. Upon learning of his transfer, Mr. Coghill asked Nursing Supervisor Shahady that he not be transferred to the floor with COVID-19 patients. Her response was, "Well, you can just go home; we all probably come into contact with COVID," or words to that effect, indicating that he should quit or work in the COVID-19 unit. Nursing Supervisor Shahady refused to rescind Mr. Coghill's reassignment and/or provide him with the disability accommodation he had in place prior to his complaints of discrimination.

36. Mr. Coghill could not afford to lose his job. Despite the severe medical risk to himself, he decided to attempt to work on the COVID-19 unit so long as they provided him with appropriate personal protective equipment ("PPE"), namely an N-95 mask. At first, MedStar, through Ms. Shahady, a Nursing Supervisor, rejected Mr. Coghill's request for an N-95, and then ultimately agreed to provide one. However,

MedStar, again through Ms. Shahady, refused to provide one that had been fit-tested, a basic requirement for an N-95 mask to be effective. As a result, Mr. Coghill was forced to work on the COVID-19 unit without proper PPE.

37. Medical best practices, MedStar policy, as well as OSHA Guidelines, 29 C.F.R. §1910.134, Appendix A ("Fit Testing Procedures (Mandatory)") (which MedStar is bound by) require that N-95 masks be fit tested, which would include fit testing for medical personnel. N-95 masks that are not fit-tested are an inadequate protection against COVID-19, because the mask does not sit properly against the face, and therefore allows the wearer to breathe in the COVID-19 virus.

38. Mr. Coghill reported the resistance he faced to obtain his OSHA-required PPE to Ms. Wongel Mengiste, who said she would "look into" his reassignment. Mr. Coghill also requested from Ms. Mengiste that he be transferred out of the COVID-19 Unit. Ms. Mengiste then incredibly advised that, rather than transfer, Mr. Coghill should avoid interacting with COVID-19 positive patients, by stating that he should "try to avoid working with COVID patients" or words to that effect. This was impossible on a unit dedicated to treating COVID-19 patients, including the location to which Mr. Coghill was transferred after filing his discrimination complaint, Floor 3East, especially when refused a fit tested N-95 mask.

39. Mr. Coghill was *never* given a different assignment allowing him to avoid the COVID Unit nor was he offered paid leave or the possibility of transferring back to the Stroke and Spinal Unit, where he was originally hired and where he worked until he made his discrimination complaint.

40. The next day, Nursing Supervisor Shahady gave Mr. Coghill two options: remain on Floor 3East (the COVID Unit) or go home.

41. During this entire time, Ms. Obu, the nurse who made the discriminatory comment Mr. Coghill complained about, remained on Floor 2West, the non-COVID-19 Unit.

42. Unsurprisingly and foreseeably, shortly after his transfer to the COVID floor where he was constantly exposed to the virus, Mr. Coghill tested positive for COVID-19. He suffered from severe COVID-19 symptoms, including intermittent loss of taste and smell, which remains as of the date of the filing of this complaint.

43. Mr. Coghill caught COVID-19 on the COVID unit of MedStar, as a direct result of MedStar's decision to require Mr. Coghill to work on the COVID unit. There was no negligence on the part of Mr. Coghill that caused him to catch COVID-19. In fact, Mr. Coghill practiced social distancing and observed CDC guidelines outside of work and in his personal life. Mr. Coghill and the only other member of his household, his significant other, were especially scrupulous about these precautions given Mr. Coghill's Immunocompromising Disability.

44. During the beginning of the pandemic and at the applicable time for this complaint, Mr. Coghill, because of his Immunocompromising Disability, limited his contact with people both inside and out of the workplace. He only traveled to work by car by himself, parked in the garage at work and performed his job duties and then commuted home alone in his car.

45. The only person Mr. Coghill had contact with at this time other than other employees and patients at work was his significant other. His significant other, in fact,

performed all grocery and other shopping for the household so that Mr. Coghill could minimize his exposure to the virus.

### Harassment Following Mr. Coghill's Diagnosis

46.     On or around June 20, 2020, Mr. Coghill became ill with COVID-19, and needed to take sick leave from the hospital. MedStar granted him 14 days of leave.

47.     Because of Mr. Coghill's Immunocompromising Disability, his battle with COVID-19 was longer than fourteen days and very difficult. He received an extension of his leave from his team at MedStar. He missed a month of work while he was recovering.

48.     From the start of his medical leave and while he was trying to get well, a nurse from MedStar's Occupational Health Office began calling daily him to ask when he would return to work. The nurse stated that Mr. Coghill "should be recovered by now" or words to that effect. Mr. Coghill was forced to explain that he was immunocompromised and would not recover at the same speed as others with healthy immune systems. MedStar continued to call him despite being on notice about his disability and the complications he was having from COVID-19.

49.     MedStar then informed Mr. Coghill that he would not receive additional paid leave to recover from COVID-19. As a result, Mr. Coghill's employment with MedStar ended on August 7, 2020 when he resigned as he could not keep being exposed to COVID-19 in the COVID Unit.

### Impact of MedStar's Discrimination and Wrongful Conduct

50.     MedStar's actions caused Mr. Coghill to lose his job, income and benefits. He was ultimately able to secure a new job where he both earns a lower salary than he did at MedStar and has no healthcare benefits. Mr. Coghill continues to experience severe

symptoms of COVID-19. His physicians have informed him that some of these COVID symptoms may be permanent, including loss of taste and smell.

51.     As a result 'of Medstar's conduct, MedStar and its employees inflicted enormous financial, reputational, medical, personal and emotional harm on Mr. Coghill.

**Policies Governing Employment at MedStar**

52.     MedStar is required to follow the District of Columbia Human Rights Act (DCHRA), which makes it unlawful for employers to discriminate on the basis of an employee's disability, religion and/or actual or perceived gender identity, as well as requires employers to make reasonable accommodations for employees with disabilities. The DCHRA also prohibits employers from retaliating against employees who make complaints of discrimination and/or who request reasonable accommodations for their disability. MedStar is similarly required to follow Title VII of the Civil Rights Act of 1964, which prohibits discrimination with respect to sexual orientation, and religion, and prohibits employers from retaliating against employees who make complaints of discrimination.  MedStar is similarly required to follow the Americans with Disabilities Act, which prohibits discrimination based on disability and requires employers to make reasonable accommodations for employees with disabilities and prohibits retaliation against employees for requesting reasonable accommodations.

53.     MedStar defines itself as an "equal opportunity employer" that is "dedicated to progress." It boasts that a "commitment to diversity is built into" its core values as an employer.

54.     MedStar's Code of Conduct ("the Code") includes a provision on Workplace Health and Safety. It is their policy to "comply with all government

13

regulations, policies, and guidelines, and to develop and enforce company polices that promote the protection of workplace health and safety." This includes OSHA Guidelines re N-95 masks, 29 C.F.R. §1910.134, Appendix A ("Fit Testing Procedures (Mandatory)").

55. The Code also claims that MedStar Health is committed to equal employment opportunity without regard to race, sexual orientation, or disability and that it will "comply with legal requirements applicable to human rights and equal employment legislation." This applies to employment practices, including but not limited to, benefits and disciplinary actions.

56. The Code prohibits "any kind of harassment in the workplace" including with regard to sexual orientation. The Code further prohibits retaliation against employees who report in good faith actual or potential violations of the law, the Code of Conduct, or MedStar Health's policies, and states that "MedStar Health will not tolerate retaliation in any form by management or non-management staff against an associate who reports in good faith, an actual or potential Code of Conduct, or any other type of legal, regulatory, compliance, quality, safety, or MedStar Health policy violation."

## COUNT I:
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)

57. Plaintiff hereby incorporates by reference each and every allegation contained above.

58. Plaintiff is a qualified individual with a disability under the ADA.

59. Plaintiff required the reasonable accommodation of avoiding close contact with COVID-19 positive patients on account of his Immunocompromising Disability.

This request was reasonable under the ADA. MedStar initially granted Plaintiff this reasonable accommodation, further evidencing its reasonableness under the ADA.

60. Defendant MedStar violated the ADA by rescinding the reasonable accommodations that he required for his disability and requiring Plaintiff to work in the COVID-19 ward.

61. As a direct and proximate cause of this illegal conduct, Plaintiff has suffered lost wages, compensable emotional distress, medical harm, reputational damage, and out of pocket expenses caused by this unlawful discrimination, and he is entitled to be fully compensated for it under the ADA.

**COUNT II:**
**FAILURE TO PROVIDE A REASONABLE ACCOMMODATION IN VIOLATION OF THE AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT (DCHRA) D.C. CODE § 2-1402.11**

62. Plaintiff hereby incorporates by reference each and every allegation contained above.

63. Plaintiff is a qualified individual with a disability under the DCHRA.

64. Plaintiff required the reasonable accommodation of avoiding close contact with COVID-19 positive patients on account of his Immunocompromising Disability. This request was reasonable under the DCHRA. MedStar initially granted Plaintiff this reasonable accommodation, further evidencing its reasonableness under the DCHRA.

65. Defendant MedStar violated the DCHRA by rescinding the reasonable accommodations that he required for his disability and requiring Plaintiff to work in the COVID-19 ward.

66. As a direct and proximate cause of this illegal conduct, Plaintiff has suffered lost wages, compensable emotional distress, medical harm, reputational damage,

and out of pocket expenses caused by this unlawful discrimination, and he is entitled to be fully compensated for it under the DCHRA.

**COUNT III:**
**RETALIATION FOR MAKING PROTECTED COMPLAINTS ABOUT DISCRIMINATION BASED ON SEX, SEXUAL ORIENTATION, AND/OR RELIGION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (Title VII)**

67. Plaintiff hereby incorporates by reference each and every allegation contained above.

68. Plaintiff made protected complaints to Defendant's management that he was being subjected to discriminatory and/or derogatory comments about his sex, sexual orientation and/or religion. Plaintiff's complaints were made in good faith. Plaintiff followed Defendant's policies in making this complaint. Plaintiff's complaints were protected activity under Title VII.

69. In response to Plaintiff's complaint, Defendant retaliated against Mr. Coghill by rescinding his reasonable accommodation and moving him to a COVID-19 floor while keeping the employee who had made the discriminatory statements at issue in her previous role on a non-COVID-19 floor at the Hospital. This was a materially adverse action to Plaintiff.

70. Defendant denied Plaintiff's requests to move back to a non-COVID-19 unit. Defendant denied Plaintiff's requests for appropriate Personal Protective Equipment (PPE), including an N-95 mask. Defendant refused to perform the proper fitting procedures required to make an N-95 mask effective. These were materially adverse actions to Plaintiff.

71. Defendant deviated from its policy of following all federal health and safety standards by not performing the test, which is required under OSHA guidelines. Failing to perform this test increased Plaintiff's exposure to the illness.

72. Plaintiff contracted COVID-19 as a direct and proximate result of Defendant's actions. As a direct and proximate cause of this illegal conduct, Plaintiff has suffered lost wages, compensable emotional distress, medical harm, and out of pocket expenses caused by this unlawful discrimination, and he is entitled to be fully compensated for it under Title VII.

**COUNT IV:**
**RETALIATION FOR MAKING PROTECTED COMPLAINTS ABOUT DISCRIMINATION BASED ON SEX, SEXUAL ORIENTATION, AND/OR RELIGION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE § 2-1402 (DCHRA)**

73. Plaintiff hereby incorporates by reference each and every allegation contained above.

74. Plaintiff made protected complaints to Defendant's management that he was being subjected to discriminatory and/or derogatory comments about his sex, sexual orientation and/or religion. Plaintiff's complaints were made in good faith. Plaintiff followed Defendant's policies in making this complaint. Plaintiff's complaints were protected activity under the DCHRA.

75. In response to Plaintiff's complaint, Defendant retaliated against Mr. Coghill by rescinding his reasonable accommodation and moving him to a COVID-19 floor and keeping the employee who had made the alleged discriminatory statements at issue in her previous role on a non-COVID-19 floor at the Hospital. This was a materially adverse action to Plaintiff.

76. Defendant denied Plaintiff's requests to move back to a non-COVID-19 unit. Defendant denied Plaintiff's requests for appropriate Personal Protective Equipment (PPE), including an N-95 mask. Defendant refused to perform the proper fitting procedures required to make an N-95 mask effective. This was a materially adverse action to Plaintiff.

77. Defendant deviated from its policy of following all federal health and safety standards by not performing the test, which is required under OSHA guidelines. Failing to perform this test increased Plaintiff's exposure to the illness.

78. Plaintiff contracted COVID-19 as a direct and proximate result of Defendant's actions. As a direct and proximate cause of this illegal conduct, Plaintiff has suffered lost wages, compensable emotional distress, medical harm, and out of pocket expenses caused by this unlawful discrimination, and he is entitled to be fully compensated for it under the DCHRA.

## Prayer for Relief

Wherefore, Plaintiff respectfully requests that this Court grant them the following relief:

79. Declare that the acts and practices of Defendant are violations of the laws prohibiting discrimination.

80. Award Plaintiff all back pay, including but not limited to wages and retirement benefits;

81. Reinstate Plaintiff to his prior position at MedStar, or alternatively, award him an appropriate amount of front pay;

82. Award Plaintiff compensatory and consequential damages against MedStar to redress his economic and emotional injuries;

83. Award Plaintiff punitive damages for Defendant's reckless disregard of, and callous indifference to, his rights to be free of disability discrimination and/or reprisal in an amount appropriate to the proof presented at trial;

84. Award Plaintiff an addition amount to account for any taxes he may be called upon to pay in relation to these awards herein;

85. Award all interest allowed by law;

86. Award Plaintiff the attorneys' fees and the costs he incurred in bringing this action;

87. Order the Defendants to undertake effective preventive actions to prevent this from occurring at Defendants' facilities in the future, and if it does, have in place remedial measures and actions;

88. Grant such other relief as this Court deems just and necessary.

## Jury Trial Demand

89. Plaintiff hereby requests a trial by jury.

Dated: October 7, 2022

JOSEPH, GREENWALD AND LAAKE, PA
 **/S/   BRIAN MARKOVITZ**
Brian J. Markovitz
DC USDC Bar. No. 481517
*Partner*
Joseph Greenwald & Laake, PA
BMarkovitz@JGLLAW.com

   **/S/ MICHAL SHINNAR**
Michal Shinnar
DC USDC No. MD0033
*Senior Counsel*
Joseph Greenwald & Laake, PA
MShinnar@jgllaw.com

6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(240) 552-1187
(240) 553-1750 (fax)
*Attorneys for Plaintiff*

19